**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| EMILY T. and AMANDA D., | |
| Plaintiffs, | Case No. 25 C 3303 |
| v. | Hon. LaShonda A. Hunt |
| SBY DOWNERS GROVE, *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Emily T. and Amanda D. initiated this action against several Chicago-area hotels asserting claims under the Trafficking Victims Protection Reauthorization Act of 2003 ("TVPRA") and the Illinois Trafficking Victims Protection Act ("ITVPA"). (Compl., Dkt. 1). Defendants move to dismiss Plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkts. 89, 90, 92, 94, 96, 99, 100). For the following reasons, the Court denies Defendants' motions in large part except as set forth below.

**BACKGROUND**

According to the complaint, Plaintiffs Emily T. and Amanda D. are two adult women who were sex trafficked by an individual referred to under the pseudonym, "Block," from 2011 through 2017. (Compl. ¶¶ 17-18, 36-37). Block forced Plaintiffs to engage in commercial sex in hotels across the Chicago metropolitan area. (*Id.* ¶ 39). Block took Plaintiffs to at least seven hotels owned or operated by Defendants, and at each hotel Plaintiffs typically:

    a.    Waited in the car while Block or one of his "girls" checked into the hotel for them;

    b.    Either were led in past the front desk by Block or entered through the back of the hotel using the key cards Block gave them;

c.  Wore revealing attire (very short dresses, high heels, minks) no matter the weather or season[;]

d.  Had visible bruises from Block's beatings—especially Amanda;

e.  Stayed in rooms with 1 to 2 additional girls working for Block;

f.  Gave Block all their "trap" (i.e. earnings) at the hotel each morning & night;

g.  Used hotel Wi-Fi to advertise their availability for commercial sex on Backpage (or Block or another girl did the same on their behalf);

h.  Left burner phones in their hotel rooms;

i.  Overstayed their reservations so that the front desk would have to call daily to ask if they intended to extend their reservations or tell them to move out;

j.  Extended reservations day-by-day with cash, at least once per stay;

k.  Always left condom wrappers, and sometimes used condoms, in the trash can of their hotel room;

l.  Stayed in rooms at the back of the hotel, preferably on the first floor, or otherwise close to an exit (because Block or one of his girls explicitly requested such a room); [and]

m.  Appeared distraught and even cried in public spaces in the hotels after fights with, and beatings from, Block[.]

(*Id.*)

## I.  <u>Comfort Inn</u>

Throughout 2015 and the first half of 2016, Block trafficked Plaintiffs at the Comfort Inn (now Best Western) at 3010 Finely Rd. in Downers Grove, Illinois. (*Id.* ¶¶ 42, 43). Defendant SBY Downers Grove, LLC ("SBY") owned and operated the Comfort Inn, and Defendant Choice Hotels franchised it. (*Id.* ¶ 43).

Plaintiffs stayed at the Comfort Inn "every month, sometimes for a week at a time, creating a consistent pattern that the hotel staff could readily observe." (*Id.* ¶ 44). Block called the hotel

"his stomping grounds" and "had a connection with an employee at the Comfort Inn who was aware that he was a pimp and coercing girls to engage in commercial sex acts." (*Id.* ¶ 45). Because of this arrangement, Plaintiffs and Block "were able to obtain rooms located in the back of the hotel." (*Id.*)

Block was present during most of Plaintiffs' stays, and during those times, "[s]creaming and fighting—between Plaintiffs, Block, and sometimes johns—were regular occurrences." (*Id.* ¶ 47). "Despite the loud disturbances, hotel staff turned a blind eye to these situations." (*Id.* ¶ 48). Additionally, "Amanda would walk around the property in torn, skimpy clothing[,] often bearing visible bruises and welts from beatings," but the hotel continued renting rooms to Block. (*Id.*) One time when Emily was severely bruised from Block's beating the previous night, an employee at the dining area in the hotel asked Emily if she was okay. (*Id.* ¶ 49). "Emily replied with a stiff 'yes' and turned a cold shoulder, her bruises and melancholic demeanor told a different story." (*Id.* ¶ 50). "But employee took no further action." (*Id.*)

During each stay at the Comfort Inn, Plaintiffs were forced to service at least ten clients per day, meaning that in a typical month, more than 100 different men would enter and exit their hotel room. (*Id.* ¶ 51). "Used condoms, lubricant packets, and other incriminating items were frequently left in their room, providing clear indications to housekeeping staff about what was occurring." (*Id.* ¶ 52).

## II.   <u>Super 8</u>

Block trafficked Plaintiffs at the Super 8 Hotel at 2080 N. Mannheim Rd. in North Lake, Illinois "[d]uring 2015 and the first half of 2016." (*Id.* ¶¶ 53, 55). Defendant Polanin Investments, Corp. ("PIC") owned and operated the Super 8, and Defendant Super 8 Worldwide, Inc. franchised it. (*Id.* ¶¶ 53-54).

Plaintiffs would stay at the Super 8 for a week or more at a time in the same hotel room, and Block often spent the night at the hotel with them. (*Id.* ¶ 55). He would not usually stay the entire week, but he would stay "long enough to make his presence known to the staff." (*Id.* ¶ 56). "Plaintiffs and johns frequently entered and exited through the Super 8's main entrance, passing the front desk each time." (*Id.*) Plaintiffs allege that they both "received looks from staff members that clearly communicated the staff's awareness that Block and Plaintiffs were involved in illegal sex work." (*Id.* ¶ 58).

While at the Super 8, Plaintiffs' "daily routine included discarding used condoms, condom wrappers, lubricant packets, and other incriminating items in quantities inconsistent with anything but coerced commercial sex work," which "would have provided clear indicators to housekeeping staff about the nature of Plaintiffs' situation." (*Id.* ¶ 59). A "regular pattern of multiple male visitors coming and going from [Plaintiffs'] room throughout the day was also an obvious sign of illegal sex work." (*Id.* ¶ 60).

## III.   Extended Stay

Plaintiffs were trafficked at the Extended Stay at 51 E. State Pkwy. in Schaumburg, Illinois "throughout 2015 and the first half of 2016." (*Id.* ¶¶ 66-67). Defendant ESA P Portfolio LLC ("ESA P") owned and operated the Extended Stay, and Defendant ESH Strategies Franchise, LLC ("ESH") franchised it. (*Id.*)

"Block forced Emily and Amanda to sell sex at the Extended Stay about every month," and [t]hey sometimes stayed for over a week at a time." (*Id.* ¶ 69). Plaintiffs' clients entered the hotel through the front door or a back door, depending on whether they "looked cool" or had a "cool car." (*Id.* ¶ 70). According to Plaintiffs, "[t]his pattern of different men using various entrances to access the same room would have created an unusual and suspicious pattern visible to hotel staff."

(*Id.*) "Staff would alert Plaintiffs when they felt there was 'an abnormal amount of traffic' coming through the hotel parking lot to visit their room." (*Id.* ¶ 72).

"The Extended Stay had particularly strict policies about checkout times." (*Id.* ¶ 71). Thus, "[w]hen Plaintiffs would overstay their paid time, hotel staff would knock on their door to enforce the checkout policy." (*Id.*) Sometimes, staff members would enter Plaintiffs' room and witness "clear signs of trafficking or commercial sexual activity like burner phones scattered about, multiple bottles of lubricant, and torn condom wrappers and used condoms." (*Id.*)

"Plaintiffs consistently requested first-floor rooms and always paid with cash," which Plaintiffs allege are "both recognized indicators of potential trafficking." (*Id.* ¶ 73). The hotel charged inconsistent rates that varied depending on when Plaintiffs wanted to rent a room. (*Id.*) Plaintiffs allege "upon information and belief" that "hotel staff used their monitoring of Plaintiffs to charge them more for extending their reservations after days when Plaintiffs had gotten more business." (*Id.*)

While at the hotel, "Emily would wander the upper floors . . . talking on the phone" and "Amanda would wander around the first floor and directly interact with hotel staff." (*Id.* ¶ 74). "Staff recognized them as regular visitors, and it was usually the same staff who saw Plaintiffs during their stays." (*Id.*) "Amanda experienced severe mental health episodes" at the hotel, "including incidents where she would scream inconsolably in the parking lot." (*Id.* ¶ 75). These incidents lead to beatings from Block "in their hotel room or in his car[,] which hotel staff could hear and at times directly observe." (*Id.*) As at other hotels, Plaintiffs frequently left behind "[u]sed condoms, lubricant packets, and other incriminating items" in their rooms. (*Id.* ¶ 76).

## IV.    Lexington Inn & Suites

"[T]hroughout 2015 and the first half of 2016," Plaintiffs were trafficked at the Lexington Inn & Suites at 1585 Dundee Ave. in Elgin, Illinois. (*Id.* ¶¶ 79-80). Defendant Litchfield Motel Inc. ("Litchfield") owned and operated the Lexington Inn & Suites. (*Id.* ¶ 79).

When staying at the Lexington Inn & Suites, Plaintiffs or Block would ask for a room near the back door. (*Id.* ¶ 81). The hotel had multiple security cameras "that captured the comings and goings of numerous men to Plaintiffs' room." (*Id.* ¶ 82). "Plaintiffs' stays at th[e] hotel were notably extended." (*Id.* ¶ 83). At Block's direction, they would stay at the hotel for up to two and a half weeks at a time. (*Id.*) "During some of these extended stays, Block would stay in the room with them, where he would periodically subject them to physical violence." (*Id.* ¶ 84).

One time, "Emily told the front desk staff that they had to wait for her to pay for the room for that day because she 'had an appointment.'" (*Id.* ¶ 85). The staff allowed Emily to maintain possession of the room past check out and pay for the extension after she "had commercial sex with the john." (*Id.* ¶ 85).

During their stays, hotel staff avoided Plaintiffs' room. (*Id.* ¶ 86). As a result, Plaintiffs rarely received fresh linens. (*Id.*) Plaintiffs allege that the staff avoided their room because they knew about Plaintiffs' activities. (*Id.*) Plaintiffs used the same room for all of their johns. (*Id.* ¶ 87). When Amanda was with a john, Emily would hide in the room. (*Id.*) When Emily was with a john, Amanda would walk around the hotel grounds. (*Id.*) "Amanda's visible injuries and revealing clothing during these walks around the property made her situation apparent to staff." (*Id.* ¶ 88).

Block and Plaintiffs frequently got into violent confrontations at the hotel, "which would have been easily heard throughout nearby areas of the hotel." (*Id.* ¶ 89). Despite this, hotel staff never called security or attempted intervention. (*Id.*) "Plaintiffs took calls constantly, and between

6

10-20 guest cars would filter through the parking lot daily just for Plaintiffs." (*Id.* ¶ 90). Plaintiffs' clientele entered and exited the hotel through a side door. (*Id.*) "This unusual traffic pattern was clearly visible to hotel staff monitoring the property." (*Id.*)

Plaintiffs always paid for their stays in cash and "had to bargain with hotel staff about payment." (*Id.* ¶ 91). Sometimes, Plaintiffs "need[ed] to wait for a john to arrive to be able to pay the next room rental fee . . . and staff knew and understood that Plaintiffs were waiting on payment to arrive before renting the room again." (*Id.*)

Plaintiffs left behind evidence of commercial sexual activity in their rooms. (*Id.* ¶ 92). "Many condom wrappers were inevitably left in the trash for hotel staff to discover, often alongside used condoms." (*Id.*)

## V.     **Marriott-Branded Hotels**

Plaintiffs were trafficked at three Marriott-branded hotels throughout 2015 and parts of 2016: (1) Courtyard Arlington Heights South at 100 W. Algonquin Rd. in Arlington Heights, Illinois; (2) Courtyard by Marriott Chicago Elgin-West Dundee located at 2175 Marriott Dr. in West Dundee, Illinois; and (3) Chicago Marriott Downers Grove at 1500 Opus Pl. in Downers Grove, Illinois. (*Id.* ¶¶ 93-94, 99, 104).

Defendant Courtyard Management LLC ("Courtyard") owned and operated the Courtyard Arlington Heights South ("Courtyard Arlington"). (*Id.* ¶ 94; *see* Dkt. 58). Block trafficked Plaintiffs at this hotel throughout 2015 and the first half of 2016. (*Id.* ¶ 93). "In addition to the activities and resulting red flags common to Plaintiffs' trafficking at every hotel, Block sometimes stayed overnight at the Courtyard Arlington . . . with Plaintiffs and therefore would have been more obviously in control of Plaintiffs at this location than some others." (Compl. ¶ 95). He extended their stays himself and paid in cash. (*Id.* ¶ 96).

Plaintiffs performed "out calls" at the Courtyard Arlington. (*Id.* ¶ 98). According to Plaintiffs, "[a]n 'out call' is when a sex worker comes to the client's own hotel room, as opposed to an 'in call' where the client comes to the sex worker's room." (*Id.*) Plaintiffs allege that their out calls created a "pattern of suspicious behavior" that gave hotel "staff another obvious clue to their victimization." (*Id.*)

Defendant Courtyard also owned and operated the Courtyard by Marriott Chicago-Elgin West Dundee ("Courtyard Dundee"), (*Id.* ¶¶ 99-10; *see* Marriott Mot. at 394 n.1, Dkt. 96),[1] where Block trafficked Plaintiffs throughout 2015 and the first half of 2016, (Compl. ¶ 93). Block frequently stayed overnight with Plaintiffs at the Courtyard Dundee. (*Id.* ¶ 101). Plaintiff Emily T. alleges that a hotel employee often stared at her and Block when they waited in the parking lot for Amanda to finish with a john. (*Id.* ¶ 102). That same employee also lingered near their room. (*Id.*) Plaintiffs allege that this employee knew or strongly suspected that they were being trafficked by Block. (*Id.* ¶ 103).

Defendant Marriott Hotel Services LLC ("Marriott") owned and operated the Marriott Downers Grove, (*Id.* ¶¶ 104-105; *see* Marriott Mot. at 394 n.1, Dkt. 96), where Block trafficked

---

[1] Unless otherwise noted, page numbers in citations to the docket reference the "PageID #" in the CM/ECF header of the document, not other page numbers in the header or footer.

Separately, Plaintiffs originally filed this suit against SBY Downers Grove, LLC; Choice Hotels International, Inc; Polanin Investments, Corp; Super 8 Worldwide, Inc; ESA P Portfolio LLC; ESH Strategies Franchise, LLC; Litchfield Motel Inc; Courtyard Management Corporation; HPTMI Properties Trust; Sodexo Management, Inc.; HMC Suites Limited Partnership; and CCMH Downers Grove Suites, LLC. (Dkt. 1). By agreement, the parties substituted (1) Marriott Hotel Services LLC for Defendants HMC Suites Limited Partnership and CCMH Downers Grove Suites, LLC; and (2) Courtyard Management LLC for Courtyard Management Corporation. (Dkt. 58). However, the parties agreed to dismiss Defendants HPTMI Properties Trust, Sodexo Management, Inc., HMC Suites Limited Partnership, and CCMH Downers Grove Suites, LLC without substituting any parties in their place. Plaintiffs originally alleged that HPTMI Properties or Sodexo Management owned the Courtyard Dundee and that HMC Suites or CCMH Downers Grove owned the Marriott Downers Grove (Compl. ¶¶ 99-100, 104-105), so it is unclear which entities Plaintiffs now allege owned the hotel. For purposes of their motion to dismiss, the Courtyard/Marriott Defendants presume that allegations referring to HPTMI Properties and Sodexo for "the Courtyard Elgin-West Dundee" apply to Courtyard Management LLC; and HMC Suites and CCMH Downers Grove for "the Marriott Downers Grove" apply to Marriott Hotel Services, LLC. (Marriott Mot. at 394 n.1). Plaintiffs do not appear to object, so the Court presumes the same.

Plaintiffs "repeatedly through 2015 and the second half of 2016." (*Id.* ¶ 106). Emily often walked by the front desk at the Marriott Downers Grove, "clearly distraught, late and night and in the early hours of the morning." (*Id.* ¶ 107). A female employee who recognized Plaintiffs from their frequent visits "often went out of her way to say hi to them when they'd come into the hotel." (*Id.* ¶ 108). This employee asked Emily if she was okay on one occasion and gave Plaintiffs a room at the end of the hall in accordance with Amanda's request. (*Id.*) According to Plaintiffs, "this female employee recognized Emily and Amanda as sex workers and trafficking victims." (*Id.* ¶ 109). Additionally, Plaintiffs bought condoms from the front desk store at the Marriott Downers Grove. (*Id.* ¶ 110).

## VI.    Choice Hotels, Super 8 Worldwide, and ESH (Franchisors)

Hotel franchisors like Defendants Choice Hotels, Super 8 Worldwide, and ESH (the "Franchisor Defendants") "set exacting brand quality standards." (*Id.* ¶ 111). Plaintiffs allege, primarily on information and belief, that the Franchisor Defendants had franchise agreements with their franchisees, including Defendants PIC, ESA P, Litchfield, Courtyard, Marriott, and SBY (the "Franchisee Defendants"), during the relevant time period, which

- required the franchisees to use the Franchisor's "proprietary computerized business system";

- allowed the Franchisor to see any time a franchisee "employee input an electronic note or took any action that affected the hotel's inventory, reservations, revenue, or personnel";

- required the franchisees to obtain prior approval from the Franchisor before hiring managers;

- required the franchisees to use specific revenue optimization software to guide the franchisees in pricing their rooms and setting compensation for their employees;

- required the franchisees to use the Franchisor's preferred vendor to set up and maintain Wi-Fi for hotel guests, thereby giving the

9

> Franchisor access to guests' browsing histories and control over whether guests may access certain sites;
>
> - required the franchisees to provide all new employees with Franchisor-mandated trainings that the employees must complete to the Franchisor's satisfaction;
>
> - preserved the Franchisor's "right to detect criminal activity using the data supplied by its control over franchisees' computer systems, as well as the right to turn over any evidence of criminal activity to law enforcement; and
>
> - required the franchisees to pay a fee to the Franchisor for failing to respond to negative reviews on online platforms.

(*Id.* ¶¶ 113, 115-119, 121, 125-126).

Plaintiffs also allege that the during the relevant time period, the Franchisor Defendants "retained the absolute right to inspect franchisee hotels at any time, and they each had the ability to levy fines or fees for failure to meet brand standards." (*Id.* ¶ 123). Additionally, "[e]ach of the franchisor Defendants knew, throughout the relevant period, that their franchise locations played host to at least thousands and likely many tens of thousands of instances of sex trafficking each year." (*Id.* ¶ 127).

## **LEGAL STANDARD**

Rule 12(b)(6) permits a party to move for dismissal based on the complaint's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In determining whether a complaint states a claim under Rule 12(b)(6), courts must accept all non-conclusory factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The Court must construe the complaint in the light most favorable to the plaintiff and draw all reasonable inferences in the plaintiff's favor. *Levy v. W. Coast Life Ins. Co.*, 44 F.4th 621, 626 (7th

Cir. 2022). A complaint will survive a motion to dismiss if it "states a plausible claim for relief." *Ashcroft*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). To state a plausible claim for relief, a complaint must "permit the court to infer more than the mere possibility of misconduct." *Id.* at 679. The movant has the ultimate burden to show that dismissal is warranted. *Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. 2021).

**DISCUSSION**

## I.     Shotgun Pleading

Several Defendants challenge Plaintiffs' complaint as an impermissible shotgun pleading. (ESA Mot. at 334-335, Dkt. 89; PIC Mot. at 346, Dkt. 90; SBY Mem. at 363, Dkt. 93; Marriott Mot. at 399-400, Dkt. 96; Litchfield Mot. at 419, Dkt. 99; Choice Mem. at 442, Dkt. 102). "Shotgun pleading refers to a pleading style in which each count of the complaint 'incorporates by reference all preceding paragraphs and counts of the complaint notwithstanding that many of the facts alleged are not material to the claim, or cause of action, appearing in a count's heading.'" *SEC v. Winemaster*, 529 F. Supp. 3d 880, 906 (N.D. Ill. 2021) (quoting *CustomGuide v. CareerBuilder, LLC*, 813 F. Supp. 2d 990, 1001 (N.D. Ill. 2011)). Such a pleading "can prevent the opposing party from reasonably being able to prepare a response or simply make the burden of doing so more difficult." *Id.* (internal quotation marks omitted) (quoting *Chriswell v. Vill. of Oak Lawn*, No. 11 C 00547, 2013 WL 5903417, at *5 (N.D. Ill. Nov. 4, 2013), *aff'd sub nom. Chriswell v. O'Brien*, 570 F. App'x 617 (7th Cir. 2014)). "But the mere fact that a complaint's counts incorporate by reference each of the preceding factual allegations does not make the complaint an impermissible shotgun pleading, so long as the complaint adequately puts the defendants on notice of the claims against them." *Id.* at 907.

11

The Court does not find Plaintiffs' complaint to be a shotgun pleading. Although the counts in the complaint incorporate by reference the preceding paragraphs and are asserted against Defendants collectively, the complaint contains Defendant-specific sections setting out the factual allegations against each Defendant. The Court acknowledges that it would have been helpful for Plaintiffs to specify which facts support each count against each Defendant, but the complaint is clear enough to provide Defendants with fair notice of the claims against them.[2] *See Winemaster*, 529 F. Supp. 3d at 906; *see also K.O. v. G6 Hosp., LLC*, 728 F. Supp. 3d 624, 641 (E.D. Mich. 2024) (collecting cases where courts have rejected arguments like Defendants').

## II. TVPRA Claims

Plaintiffs assert Counts I and II under Section 1595(a) of the TVPRA, which allows victims of sex trafficking and other crimes to "bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter)." 18 U.S.C. § 1595(a). Accordingly, Section 1595 allows for perpetrator liability and beneficiary liability. *See G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 552 (7th Cir. 2023) ("Section 1595 creates two kinds of civil liability: perpetrator liability and participant liability.").

Plaintiffs allege that they are entitled to bring a Section 1595(a) action because they are victims of sex trafficking under 18 U.S.C. § 1591(a), (Compl. ¶ 129), which criminalizes the sex

---

[2] Some of the Defendants also take issue with the section of the complaint describing what Plaintiffs "usually" did at Defendants' hotels. (*See* Compl. ¶ 40). For example, Courtyard and Marriott argue that none of the "allegations provide sufficient information to put the Marriott Property Defendants on notice of whether the particular allegation actually occurred and pertains to Courtyard, Marriott Hotel Services, or any of the other Defendants." (Marriott Mot. at 400; ESA Mot. at 331-332). However, the Court reads that section as summarizing the Defendant-specific allegations set out later in the complaint, rather than asserting new allegations against each Defendant. The allegations are arguably supported by reasonable inferences, but that point is immaterial because there are other allegations sufficient to support the surviving claims as discussed below.

trafficking of children or adults by force, fraud, or coercion. 18 U.S.C. § 1591(a). Defendants do not appear to contest that Plaintiffs are victims of sex trafficking, but they do contend that the complaint fails to plausibly allege that *Defendants* were the perpetrators or beneficiaries of Plaintiffs' trafficking. (*See* Marriott Mot. at 396; Choice Mem. at 440; ESA Mot. at 330; PIC Mot. at 344; Super 8 Mem. at 380; Litchfield Mot. at 417). Choice Hotels also argues that Plaintiffs' TVPRA claims are barred in part by the statute's 10-year statute of limitations. (Choice Mem. at 442, Dkt. 102). The Court will address the statute of limitations and then consider whether Plaintiffs have stated perpetrator and/or beneficiary liability claims against Defendants.

### A.  <u>Statute of Limitations</u>

Plaintiffs allege that they were trafficked at Defendants' hotels "throughout" or "during" 2015 and either the first or second half of 2016. (Compl. ¶ 44, 55, 68, 80, 93, 106). The TVPRA provides that "[n]o action may be maintained under subsection (a) unless it is commenced not later than the later of . . . (1) 10 years after the cause of action arose; or (2) 10 years after the victim reaches 18 years of age, if the victim was a minor at the time of the alleged offense." 18 U.S.C. § 1595(c). Because Plaintiffs do not allege that they were minors at any time relevant to their claims, Choice Hotels argues that they are barred from asserting claims based on events that occurred more than 10 years before the filing of the complaint, *i.e.*, March 27, 2015. (Choice Mem. at 442).

"Dismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009). "As long as there is a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense, questions of timeliness are left for summary judgment (or ultimately

trial), at which point the district court may determine compliance with the statute of limitations based on a more complete factual record." *Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys, Inc.*, 782 F.3d 922, 928 (7th Cir. 2015). Nevertheless, "a district court may dismiss under Rule 12(b)(6) something that is indisputably time-barred." *Small v. Chao*, 398 F.3d 894, 898 (7th Cir. 2005).

Here, the complaint does not include specific dates, so it is unclear whether Plaintiff's TVPRA claims are based on any pre-March 27, 2015 events. (*See* Dkt. 1). This seems possible, considering Plaintiffs argument that their claims are timely under the continuing violation doctrine, or alternatively, that equitable tolling applies. (Resp. at 497, 499, Dkt. 106). But because Plaintiffs' claims are not "indisputably time-barred" on the face of the complaint, dismissal on statute of limitations grounds is unwarranted at this time. *Small*, 398 F.3d at 898; *see Cancer Found.*, 559 F.3d at 674-675 (explaining that "dismissal is appropriate when the plaintiff pleads himself out of court by alleging facts sufficient to establish the complaint's tardiness").[3]

### B. Perpetrator Liability (Count I)

Plaintiffs allege in Count I that, "[t]hrough their reckless disregard of the circumstances described [in the complaint], Defendants are 'perpetrator[s]' of Plaintiffs' sex trafficking within the meaning of 18 U.S.C. § 1591 (a)(1) and (a)(2) are thus subject to direct liability under 18 U.S.C. § 1595." (Compl. ¶ 130) (second alteration in original). Plaintiffs further allege that "Defendants perpetrated Plaintiffs' sex trafficking by, among other things, harboring or providing them within the meaning of the statute." (*Id.* ¶ 131).

---

[3] The Court notes that *even if* these events began pre-3/27/15, the nature of these claims is such that it would likely take time and repeated conduct and observation over the 2015/2016 period to give rise to the cause of action. Furthermore, while it is true that pre-3/27/15 conduct could theoretically be time-barred, the complaint alleges post-3/27/15 conduct which would remain actionable.

14

In response to Defendants' motions, however, Plaintiffs conceded dismissal of Count I as to the Franchisor Defendants. (Resp. at 480 n. 1). Plaintiffs further conceded their theory that Defendants "provided" Plaintiffs within the meaning of 18 U.S.C. § 1595(a)(1). (*Id.* at 480 n.2). Consequently, Plaintiffs remaining allegations are that Franchisee Defendants only "are liable as 'harboring' perpetrators because they knowingly provided shelter and refuge for Emily's and Amanda's sex work, while disregarding a known risk that they were being coerced." (*Id.* at 480).

Although Defendants filed separate motions, they generally argue that the complaint fails to plausibly allege that they had knowledge of Plaintiffs' alleged trafficking or "harbored" Plaintiffs within the meaning of the TVPRA. (*See* PIC Mot. at 348; ESA Reply at 523-524, Dkt. 108; Litchfield Mot. at 423; Marriott Mot. at 406-407; SBY Reply at 568, Dkt. 112).

To sufficiently plead knowledge, Plaintiffs must plausibly allege that the Franchisee Defendants harbored Plaintiffs "knowing, or . . . in reckless disregard of the fact, that means of force, threats of force, fraud, coercion . . . or any combination of such means" would be used to cause Plaintiffs to engage in a commercial sex act.[4] 18 U.S.C. § 1591(a); *see Doe (K.R.D.) v. Hilton Worldwide Holdings Inc.*, 798 F. Supp. 3d 1082, 1099 (N.D. Cal. 2025) (explaining that "the perpetrator theory imports the criminal liability standards of section 1591 and thus requires pleading actual knowledge or reckless disregard"). "What the statute requires is that the defendant

---

[4] Because Plaintiffs do not allege that Defendants had actual knowledge of Plaintiffs' trafficking (*see* Compl. ¶ 130), they argue that the complaint plausibly alleges that Defendants acted with reckless disregard. (Resp. at 482). Plaintiffs contend that "a defendant acts 'in reckless disregard of' a fact if he acts while knowing of a 'substantial and unjustifiable risk' that the fact is true," (Resp. at 476) (quoting *United States v. Rodriguez*, 880 F.3d 1151, 1162 (9th Cir. 2018), and that a person is therefore "a perpetrator of sex trafficking under § 1591(a) if he knowingly harbors a person while knowing there is 'a substantial and unjustifiable risk' that the person will be caused to engage in commercial sex by threat of any harm sufficient to convince a reasonable person of the victim's background and in the victim's circumstances to engage in commercial sex." (*Id.* at 477). Plaintiff's interpretation of "reckless disregard" is somewhat puzzling because it is untethered to the TVPRA case law. As Defendant PIC observes, "Plaintiffs do not address or discuss any of the TVPRA case law on the mens rea requirement for a perpetrator liability claim," (PIC Reply at 503, Dkt. 107), instead relying on inapposite cases. (*See* Resp. at 481-486). Plaintiffs provide no explanation for their disregard of relevant case law. But, in any event, Defendants "bear[] the burden of establishing the insufficiency of the complaint's allegations," which they generally have not done. *Arora v. Kharat*, No. 3:20-CV-50387, 2023 WL 1069872, at *1 (N.D. Ill. Jan. 27, 2023) (citing *Marcure*, 992 F.3d at 631).

kn[ew] in the sense of being aware of an established modus operandi that will in the future cause a person to engage in prostitution." *J.M. v. Choice Hotels Int'l, Inc.*, No. 2:22-CV-00672-KJM-JDP, 2023 WL 3456619, at *2 (E.D. Cal. May 15, 2023) (internal quotation marks omitted) (quoting *United States v. Todd*, 627 F.3d 329, 334 (9th Cir. 2010)).

For perpetrator liability claims, "district courts tend to look beyond allegations of 'red flag' signs that should have put a defendant on notice of sex trafficking, and in particular focus on allegations regarding hotel staff actions or duration and age that are suggestive of actual knowledge of sex trafficking." *Doe v. Wyndham Hotels & Resorts*, No. 2:23-CV-01676-DAD-CSK, 2025 WL 85831, at *13 (E.D. Cal. Jan. 7, 2025) (collecting cases). Knowledge "may be alleged generally," Fed. R. Civ. P. 9(b), so "the Court will accept 'general allegations of knowledge insofar as they are consistent with reasonable inferences we can draw from the facts in the complaint.'" *Santiago v. Tesla, Inc.*, 757 F. Supp. 3d 831, 842 (N.D. Ill. 2024) (quoting *Ibarolla v. Nutrex Rsch., Inc.*, No. 12 C 4848, 2013 WL 672508, at *3 (N.D. Ill. Feb. 25, 2013)).

Although the TVPRA does not define "harbor," "[o]ther courts have found that a hotel defendant knowingly harbors a trafficking victim when it affords shelter or lodging to her by renting a room in which she is housed to her trafficker." *C.C. v. Jamal F. Rashid*, No. 2:23-cv-02056-GMN-BNW, 2026 U.S. Dist. LEXIS 18744, at *18 (D. Nev. Jan. 29, 2026) (collecting cases). Therefore, "courts routinely find that, when hotel staff observe red flags—including cash payments, extended stays, foot traffic, and young women on the property—and then continue to rent hotel rooms to the traffickers, the plaintiff has done enough to survive a motion to dismiss on her harboring claim." *S.W. v. Tropical Paradise Resorts, LLC*, No. 25-CV-60771, 2026 WL 806786, at *14 (S.D. Fla. Mar. 24, 2026) (citing *Doe v. Wyndham Hotels & Resorts*, 2025 WL 85831, at *15).

16

The Court concludes that Plaintiffs state a perpetrator liability claim against Defendants PIC, SBY, ESA P, Litchfield, and Courtyard, but not Marriott.

### i. PIC

PIC argues that Plaintiffs' "PIC-specific allegations could theoretically support a plausible argument that staff of the subject Super 8 knew or should have known that Plaintiffs were commercial sex workers, but simply do not rise to the standard of factual specificity that must be made to show actual knowledge of fraud or force." (PIC Mot. at 348). The Court disagrees. Plaintiffs allege that PIC owned and operated the Super 8, where:

- Plaintiffs stayed more for a week or more at a time, and Block stayed with them "long enough to make his presence known to the staff, who could see that Block had Plaintiffs under his thumb";

- "Both Plaintiffs and johns frequently entered and exited through the Super 8's main entrance, passing the front desk each time";

- Hotel staff gave Plaintiffs non-verbal cues and looks "that clearly communicated the staff's awareness that Block and Plaintiffs were involved in illegal sex work";

- Plaintiffs' "daily routine included discarding used condoms, condom wrappers, lubricant packets, and other incriminating items in quantities inconsistent with anything but coerced commercial sex work," which would have provided clear indicators to housekeeping staff about the nature of Plaintiffs' situation";

- There was a "regular pattern of multiple male visitors coming and going from [Plaintiffs'] room throughout the day;

- Plaintiffs were visibly distressed; and

- "Despite these clear indicators, the Super 8 continued to rent rooms to both Block and his women."

(Compl. ¶¶ 53, 56-61).

17

At this stage, Plaintiffs' factual allegations support a reasonable inference that the Super 8's staff, and therefore PIC, acted with reckless disregard towards the fact that Block was trafficking Plaintiffs at the Super 8 yet continued to rent rooms to them. *See Dana Container, Inc. v. Sec'y of Lab.*, 847 F.3d 495 (7th Cir. 2017) ("When an employee is acting within the scope of her employment, her knowledge is typically imputed to the employer."); *Doe v. Choice Hotels*, No. 6:23-CV-1012-JSS-LHP, 2024 WL 2955728, at *5 (M.D. Fla. June 12, 2024) (considering the actions and knowledge of hotel operator's staff taken within the scope of their employment for the hotel's benefit as imputed to the hotel operator). Plaintiffs not only allege that the staff observed several indicia of trafficking, but also that they communicated their awareness of Plaintiffs' trafficking to Plaintiffs themselves. Considering "'[c]ourts have found that allegations of continued collaboration with traffickers, failure to intervene despite known red flags, and facilitating trafficking conduct can support [ ] a claim' of perpetrator liability," Plaintiffs have stated a perpetrator liability claim against Defendant PIC. *S.W.*, 2026 WL 806786, at *11 (second alteration in original) (quoting *Doe (K.R.D.) v. Wyndham Hotels & Resorts, Inc.*, No. CV 24-8174 (SDW) (JBC), 2025 WL 1166519, at *3 (D.N.J. Apr. 21, 2025)). Accordingly, PIC's motion to dismiss will be denied as to perpetrator liability for harboring in Count I.

### ii. SBY

SBY argues that Plaintiffs have not alleged any facts to support that SBY acted with reckless disregard or knowingly harbored them in violation of Section 1591(a)(1). (SBY Mem. at 366). SBY further contends that if "Plaintiffs are attempting to rely on their assertion that Plaintiffs' trafficker had a 'connection with an employee at the Comfort Inn,' as a basis to support their claim of perpetrator liability against SBY, Plaintiffs' reliance is misplaced." (*Id.*) Rather, SBY asserts, "[t]his unnamed employee's alleged criminal conspiracy (to the extent it occurred, which SBY denies) was outside the scope of his employment and was not in furtherance of SBY's business,

18

and thus any such conduct or knowledge cannot be imputed to SBY and does not support imposing liability on SBY." (*Id.* at 366-367) (citing *Adames v. Sheahan*, 233 Ill. 2d 276, 298 (2009)).

Even if the Court sets aside Plaintiffs' allegations about the unnamed employee at the Comfort Inn, Plaintiffs state a perpetrator liability claim against SBY. They allege that at the Comfort Inn, which SBY owned and operated:

- Plaintiffs stayed "every month, sometimes for a week at a time, creating a consistent pattern that hotel staff could readily observe";

- Amanda walked "around the property in torn, skimpy clothing—often bearing visible bruising and welts from beatings";

- Block was present most of the time, "and it was clear to hotel staff that it was a pimp";

- A female employee asked Emily if she was okay after Block had severely bruised her;

- In a typical month, "more than a 100 different men would enter an exit [Plaintiffs'] hotel room," and "[h]otel staff were well aware of the strange men coming and going from Plaintiffs' room;

- Plaintiffs, Block, and john regularly got into loud verbal and physical disputes;

- Plaintiffs left behind evidence of commercial sex activity in their rooms;

- The hotel continued to rent rooms to Block and Plaintiffs despite the above.

(Compl. ¶¶ 42, 44, 47-52). For the same reasons Plaintiffs' allegations against PIC are sufficient, these allegations alone are sufficient to support Count I against SBY. And, despite SBY's argument, Plaintiffs' allegation that Block had a connection with an employee at the Comfort Inn affirms the plausibility of their claim as well.

19

Under the doctrine of *respondeat superior*, an employer is liable for employees' actions that occur within the scope of their employment. Restatement (Third) Of Agency § 2.04 (A.L.I. 2006).[5] "An employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control." *Id.* ¶ 7.07. On the other hand, "[a]n employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer." *Id.*

Here, Plaintiffs allege that "[o]n information and belief, Block had a connection with an employee at the Comfort Inn who was aware that he was a pimp," and that "[d]ue to this arrangement, they were able to obtain rooms located in the back of the hotel, which meant they drew less attention from guests and made johns feel safe." (Compl. ¶¶ 45-56). SBY argues that the unnamed employee's knowledge cannot be imputed to them because Plaintiffs do not allege that the employee was acting within the scope of his or her employment or in furtherance of SBY's business. (SBY Mem. at 367-368). However, there is no indication that the employee allowed Block to rent rooms at the back of the Comfort Inn "for any purpose other than generating rental income, *i.e.,* promoting their employer's business interests." *Doe v. G6 Hosp., LLC*, No. 2:24-CV-01235-RSL, 2025 WL 1167550, at *6 (W.D. Wash. Apr. 22, 2025) (rejecting arguments similar to SBY's). Accordingly, the employee's knowledge can be imputed to SBY, which further supports

---

[5] The parties appear to disagree on whether Illinois agency law or the federal common law of agency governs here, (*see* Resp. at 491; SBY Mem. at 367), and "the statutory text of the TVPRA does not address the question of indirect liability," *Doe (K.R.D.)*, 798 F. Supp. 3d at 1090. However, "[t]he Seventh Circuit has observed that 'the federal common law of agency, Illinois agency law, and the Restatement of Agency are all in accord on general agency principles.'" *Nat'l Fair Hous. All. v. Deutsche Bank Nat'l Tr.*, No. 18 C 839, 2019 WL 5963633, at *11 (N.D. Ill. Nov. 13, 2019) (quoting *NECA-IBEW Rockford Loc. Union 364 Health & Welfare Fund v. A & A Drug Co.*, 736 F.3d 1054, 1058 (7th Cir. 2013)). Thus, the difference is immaterial, and the Court will look to all three sources of authority.

Plaintiff's perpetrator liability claim. Accordingly, SBY's motion to dismiss will be denied as to perpetrator liability for harboring under Count I.

### iii. ESA P

Plaintiffs also sufficiently plead a perpetrator liability claim against Defendant ESA P. The complaint alleges that staff of the Extended Stay, which ESA P Portfolio owned and operated, continued to rent rooms to Plaintiffs and Block even though they observed different men coming and going from Plaintiffs room; saw evidence of commercial sex activity, such as used condoms, burner phones, and multiple bottles of lubricant, in Plaintiffs' room; alerted Plaintiffs when they believed "there was 'an abnormal amount of traffic' coming through the hotel parking lot to visit their room"; charged Plaintiffs different rates depending on when Plaintiffs saw clients; recognized Plaintiffs from their regular stays and observed them wandering the halls; and witnessed Amanda experience "severe mental health episodes" and get beaten by Block. (Compl. ¶¶ 66, 70-76). Plaintiffs also allege that they "consistently requested first-floor rooms and always paid with cash" at the Extended Stay. (*Id.* ¶ 73). As "[c]ourts routinely find that hotel operators who accept cash payments from traffickers, accommodate the traffickers' room requests, and ignore red flags can be liable as perpetrators under the TVPRA," *S.W.*, 2026 WL 806786, at *12 (citing *K.R.D.*, 798 F. Supp. 3d at 1100), ESA P Portfolio's motion to dismiss will be denied as to Count I.

### iv. Litchfield

The complaint alleges that Defendant Litchfield owned and operated the Lexington Inn & Suites and at that hotel staff continued to rent Plaintiffs and Block rooms even though:

- Plaintiffs or Block asked for rooms near the back door;

- The hotel's cameras captured numerous men coming and going from Plaintiffs' room;

21

- Emily once told hotel staff that they had to wait for her to pay for the room that day because she "had an appointment," and the staff allowed her to retain possession of the room past check out;

- Hotel staff purposefully avoided Plaintiffs' room, rarely giving them fresh linens;

- Amanda wandered the hotel grounds in revealing clothes and with visible injuries whenever Emily was with a John;

- Block and Plaintiffs regularly got into violent confrontations "which would have been easily heard throughout nearby areas of the hotel":

- "Between 10-20 non-guest cars would filter through the parking lot daily just for Plaintiffs";

- Plaintiffs always paid cash and sometimes had a wait for a john to arrive to be able to pay, which staff understood; and

- Plaintiffs left behind physical evidence of commercial sex activity in their rooms.

(Compl. ¶¶ 79, 81-92).

Like Plaintiffs' allegations against Defendants PIC, SBY, and ESA P, these allegations all make Plaintiffs' perpetrator liability claim against Litchfield plausible. Litchfield argues, generally, that Plaintiffs' allegations are insufficient because each alleged red flag could have an innocuous alternative explanation, (*see* Litchfield Mot. at 423-430), but Litchfield improperly considers these details in a vacuum. When viewed as a whole and reasonable inferences are drawn from them, Plaintiffs' claim is plausible. As a result, Litchfield's motion to dismiss will also be denied as to perpetrator liability for harboring under Count I.

### v. **Courtyard**

Plaintiffs allege that Defendant Courtyard owned the Courtyard Arlington and the Courtyard Dundee (Compl. ¶¶ 94, 99). Because Plaintiffs' allegations regarding the Courtyard Arlington are not meaningfully different from those regarding the previously discussed hotels,

22

Plaintiffs state a perpetrator liability claim against Defendant Courtyard with respect to their alleged trafficking activity at the Courtyard Arlington. On the other hand, these allegations fall short for the Courtyard Dundee.

With respect to the Courtyard Dundee, Plaintiffs provide the following barebones and conclusory allegations:

- Block frequently stayed at the hotel overnight with Plaintiffs, "and his control over Plaintiffs would thus have been more obvious at this location than at most others";

- A hotel worker "frequently stared at Emily and Block as they waited in their car for Amanda to finish a commercial sex transaction with a client in their hotel room," and he lingered near their room;

- "Upon information and belief," the hotel worker "knew—or at least strongly suspected—that Emily and Amanda were being trafficked by Block."

(Compl. ¶¶ 101-133). Those factual allegations regarding the Courtyard Dundee are thin, and fail to plausibly support Plaintiffs' contention that the hotel worker knew or suspected they were being trafficked. Without more, Plaintiffs have not stated a perpetrator liability claim against Courtyard based on their time at the Courtyard Dundee.

Consequently, Courtyard's motion to dismiss will be granted to the extent Count I arises from Plaintiffs' trafficking at Courtyard Dundee, be denied to the extent Count I arises from Plaintiffs' trafficking at the Courtyard Arlington.

### vi. **Marriott**

Plaintiffs fail to state a perpetrator liability claim against Defendant Marriott entirely. According to the complaint, Marriott owned and operated the Mariott Downers Grove, where:

- Block trafficked Plaintiffs repeatedly in 2015 and 2016;

23

- "Emily frequently walked past the front desk at this location, clearly distraught, late at night and in the early hours of the morning";

- A female employee who recognized Plaintiffs from their frequent visits "often went out of their way to say hi to them," asked Emily if she was okay one time, "obliged Amanda's request and gave them a room all the way down the hall", and "on information and belief," recognized Plaintiffs "sex workers and trafficking victims, but a combination of her employer's policies and her own desire to avoid causing a scene led to her to assist in their trafficking instead of attempting to thwart it"; and

- Plaintiffs bought condoms from the front desk store.

(Compl. ¶¶ 105-110). Plaintiffs simply plead no facts supporting their conclusory allegation that the employee knew that Plaintiffs were sex trafficking victims. Moreover, Plaintiffs do not allege that any hotel staff knew of Block or interacted with him. Because Plaintiffs' allegations do not make it plausible that Marriott was a "perpetrator" within the meaning of Section 1591, Defendant Marriott's motion to dismiss will be granted as to Count I.

In sum, Count I survives against Defendants PIC, SBY, ESA P, Litchfield, and Courtyard (relative to Courtyard Arlington only), as indicated.

## C. **Beneficiary Liability (Count II)**

Plaintiffs allege in Count II that "Defendants knowingly and financially benefitted from participation in a venture which they knew or should have known constituted sex trafficking under 18 U.S.C. § 1591 and are thus subject to direct liability under 18 U.S.C. § 1595." (Compl. ¶ 134). A claim under the "financial beneficiary" prong of Section 1595(a) requires a plaintiff to "allege and ultimately prove that (1) a venture has engaged in an act in violation of Section 1591, (2) the defendant knew or should have known that the venture had violated Section 1591, (3) the defendant participated in that venture, and (4) the defendant knowingly benefited from its participation." *G.G.*, 76 F.4th at 553.

24

All of the Defendants argue that the complaint fails to plausibly allege the second and third elements, *i.e.*, that Defendants participated in a venture which they knew or should have known was engaged in sex trafficking. (PIC Mot. at 351; Super 8 Mem. at 384-387; ESA Mot. at 335-337; Marriott Mot. at 401-403; SBY Mem. at 368; Choice Mem. at 451-453). Super 8 and SBY also argue that the complaint fails to sufficiently plead the fourth element: that they knowingly benefited from participation in the alleged sex trafficking venture. (Super 8 Mem. at 392; SBY Mem. at 368).

Although "Congress has not defined 'participation' under Section 1595," "Section 1591 defines 'participation in a venture' as 'knowingly assisting, supporting, or facilitating a violation' of Section 1591(a)(1)." *G.G.*, 76 F.4th at 558 (quoting 18 U.S.C. § 1591(e)(4) (April 2018, December 2018)). The Court may not import Section 1591's definition of "participation in a venture" into Section 1595, but "Section 1591's definition can establish the upper limits of 'participation' under Section 1595." *Id.* at 558-559. Accordingly, "'participation' does not . . . require more than 'assisting, supporting, or facilitating' a venture that violates Section 1591. *Id.* at 559 (quoting 18 U.S.C. § 1591(e)(4) (April 2018, December 2018)).

The Seventh Circuit "read[s] 'participation' in accord with [its] 'ordinary understanding of culpable assistance to a wrongdoer,' which requires only 'a desire to promote the wrongful venture's success.'" *Id.* (quoting *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003)). So "[a] plaintiff may sufficiently allege such 'culpable assistance' by showing 'a continuous business relationship' between the participant and the trafficker." *Id.* (quoting *G.G.*, 603 F. Supp. 3d at 644). "Where the participant provides assistance, support, or facilitation to the trafficker through such a 'continuous business relationship,' a court or jury may infer that the participant and trafficker have a 'tacit agreement' that is sufficient for 'participation' under Section 1595." *Id.* (quoting *M.A. v.*

*Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 970-971 (S.D. Ohio 2019)). At the pleadings stage, "all that is necessary is for a plaintiff to allege such a 'continuous business relationship,' which gives rise to an inference, drawn in the plaintiff's favor, that the civil defendant facilitated the venture's success." *Id.* at 560.

To sufficiently plead knowledge for a beneficiary claim, "a plaintiff needs to allege plausibly that the defendant "had constructive knowledge that a venture generally has violated Section 1591." *G.G.*, 76 F.4th at 558 (emphasis removed). This element is "is analyzed under a negligence standard," and "[t]he focus is not on whether the defendant had knowledge of the specific plaintiff's experience, but instead on whether the defendant had constructive knowledge that the specific venture violated § 1591." *K.O.*, 728 F. Supp. 3d at 644; *see G.G.*, 76 F.4th at 558 ("[W]e agree with the majority of courts that have addressed Section 1595's constructive-knowledge requirement that the statutory text does not require allegations and ultimately proof that the defendant knew or should have known of the specific victim who has brought the civil action.").

Finally, the fourth element of a beneficiary liability claim "merely requires a plaintiff to plausibly allege that a defendant 'knowingly receive[d] a financial benefit' in some way from its participation in the venture." *K.O.*, 728 F. Supp. 3d at 542 (quoting *T.E. v. Wyndham Hotels & Resorts, Inc.*, No. 2:22-CV-3185, 2024 WL 474400, at *4 (S.D. Ohio Feb. 7, 2024)). The perpetrator need not have "actual knowledge of the sex trafficking venture." *T.E.*, 2024 WL 474400, at *4; *see also G.G.*, 76 F.4th at 565 ("[A]s the statutory text clearly dictates, where the defendant is simply aware that it is benefiting, that is enough."). Thus, "[c]ourts have generally held that receipt of a fee from 'the rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element.'" *K.O.*, 728 F. Supp. 3d at 642

26

(citing *A.C. v. Red Roof Inns, Inc.*, No. 2:19-CV-4965, 2020 WL 3256261, at *4 (S.D. Ohio June 16, 2020) and *J.G. v. Northbrook Indus., Inc.*, 619 F. Supp. 3d 1228, 1234 (N.D. Ga. 2022)).

Having determined that Plaintiffs have plausibly alleged claims against Defendants PIC, SBY, ESA P, Litchfield Motel, and Courtyard (with respect to the Courtyard Arlington only) under the more stringent standard for perpetrator liability, the Court concludes that Plaintiffs have also plausibly alleged beneficiary liability claims against those defendants as well. The Court thus considers whether Plaintiffs' allegations are sufficient to state beneficiary liability claims against the remaining Defendants.

###    i.    Courtyard (as to the Courtyard Dundee)

For the same reasons Plaintiffs' allegations regarding the Courtyard Dundee are too conclusory to state a perpetrator liability claim against Courtyard based on their trafficking at that hotel, even under the less stringent standard for a beneficiary liability claim, they are still too conclusory. Indeed, Plaintiffs plead no facts that make it plausible that Courtyard knew or should have known about Plaintiffs' trafficking or had a continuing business relationship with Block. Accordingly, Count II against Courtyard will be dismissed to the extent based on Plaintiffs' alleged trafficking at the Courtyard Dundee.

###    ii.    Marriott

The allegations in the complaint concerning the Mariott Downers Grove are too conclusory to state a beneficiary liability claim against Marriott as well. As discussed previously, the complaint includes no facts supporting Plaintiffs' conclusory allegation that a hotel employee knew that they were sex trafficking victims, and Plaintiffs do not allege that hotel staff were aware of Block. Because Plaintiffs have neither stated a beneficiary liability claim nor a perpetrator liability claim against Marriott, the Court will grant Marriott's motion to dismiss.

### iii. <u>Franchisor Defendants</u>

Before addressing Plaintiffs' beneficiary liability claims against the Franchisor Defendants, the Court notes that Defendants ESA P and ESH contend that the Extended Stay "was not a franchised location," so Plaintiffs' franchisor/franchisee allegations are "irrelevant to ESA." (ESA Mot. at 333). ESA P and ESH provide no support for their position. But regardless, their "argument is improper because it is a factual assertion outside the pleadings, which the Court does not consider on a motion to dismiss." *Cilliers v. Cobalt Holdings, Inc.*, No. 18 C 2428, 2018 WL 5078383, at *2 (N.D. Ill. Oct. 18, 2018) (*Doss v. Clearwater Title Co.*, 551 F.3d 634, 639 (7th Cir. 2008)). It is well-settled that the Court must accept the factual allegations in the complaint as true when ruling on a Rule 12(b)(6) motion. *Ashcroft*, 556 U.S. at 678. The Court therefore considers ESH the franchisor of the Extended Stay for purposes of resolving Defendants' motion. (*See* Compl. ¶ 67). That being settled, the Court will now determine whether Plaintiffs have stated beneficiary liability claims against the Franchisor Defendants.

Plaintiffs argue that the Franchisor Defendants are liable as beneficiaries of their trafficking directly, vicariously, or as joint employers at the hotels where Plaintiffs were trafficked. (Resp. at 491). Choice Hotels and Super 8 argue at the outset that Plaintiffs are barred from relying on vicarious liability and joint employer theories because they are not alleged in the complaint. (Choice Mem. at 454 n.14; Super 8 Reply at 561, Dkt. 111). In response, Plaintiffs contend that they allege sufficient facts to support both theories, and they need only plead "factual allegations, not legal theories." (Resp. at 491 n.3) (internal quotation marks omitted) (quoting *Whitaker v. Milwaukee Cnty.*, 772 F.3d 802, 808 (7th Cir. 2014)).

Although it is true that the complaint does not explicitly reference "vicarious," "agent," or "joint employer," Plaintiffs allege facts sufficient to place Defendants on notice that that their

28

claims may rest on indirect liability theories. Choice Hotels seemingly suspected that Plaintiffs might raise vicarious liability at least because it mentioned vicarious liability in its memorandum of law. (Choice Mem. at 454 n.14) (stating that it "shall not address any theory of vicarious liability" because "Plaintiffs do not allege that Choice is vicariously liable in any form for the alleged acts of the independent owner and operator franchisee"). In any event, Plaintiffs are correct that "[a] complaint need not plead legal theories," so they may argue that the Franchisor Defendants are vicariously liable and joint employers. *Joseph v. Elan Motorsports Techs. Racing Corp.*, 638 F.3d 555, 561 (7th Cir. 2011) (collecting cases).

### a. Direct Liability

The Franchisor Defendants all argue that Plaintiffs have not alleged that they participated in a venture which they knew or should have known was engaged in sex trafficking. (ESH Mot. at 335-337; Super 8 Mot. at 384-387; Choice Mem. at 451-453). The Court agrees. To sufficiently plead participation, Plaintiffs must allege that Block and the Franchisor Defendants had a "continuous business relationship" indicative of a "tacit agreement" between them. *G.G.*, 76 F.4th at 559 (internal quotation marks omitted) (quoting *M.A.*, 425 F. Supp. 3d at 970–71). Nothing in the complaint indicates that Block had a relationship with the Franchisors, much less a "continuous business relationship." The allegations in the complaint indicate that Block interacted directly with the Franchisee Defendants or their staff only. Although the complaint identifies relationships between the Franchisors and their Franchisees, Plaintiffs' allegations "describe a general-franchisor-franchisee relationship," rather than a venture engaged in sex trafficking. *J.M. v. Choice Hotels Int'l, Inc.*, No. 2:22-CV-00672-KJM-JDP, 2022 WL 10626493 (E.D. Cal. Oct. 18, 2022), at *4.

As to knowledge, Plaintiffs argue that the Franchisors "knew, based on public-facing reviews and their own internal records, that their franchisees were harboring trafficking victims on a significant scale." (Resp. at 106). However, Plaintiffs' argument is unconvincing for two reasons. First, the complaint alleges that the Franchisor Defendants read online reviews for their franchised hotels and that reviews of the Super 8 and Extended Stay complained of open prostitution, but absent from the complaint are the dates of those reviews and any reviews about the Comfort Inn. (Compl. ¶¶ 63-64, 77-78). Second, it is unclear what "internal records" Plaintiffs reference or how these records would have revealed their trafficking because Plaintiffs describe no such "records" in the complaint. In addition, Plaintiffs' allegations about the Franchisor Defendants' "general knowledge of sex trafficking problems in the hotel industry, or even at defendants' franchisee hotels, [are] insufficient to demonstrate defendants should have known about [Plaintiffs] trafficking." *J.M.*, 2022 WL 10626493, at \*5. (*See* Compl. ¶ 127) (alleging that the Franchisor Defendants knew about sex trafficking at their franchise locations).

In sum, Plaintiffs have failed to allege that the Franchisor Defendants participated in a venture that they knew or should have known violated Section 1595.[6] Their direct beneficiary liability claim thus fails.

### b. **Indirect Liability**

Plaintiffs argue that they "allege facts supporting two indirect liability theories: (1) Defendants are liable under agency law because they controlled the day-to-day activities of the property owners through their strict policies and brand standards, and (2) Defendants are liable as employers (or joint employers) of hotel staff." (Resp. at 491). Choice Hotels and Super 8 argue

---

[6] Super 8 also argues that Plaintiffs fail to plausibly allege the "knowingly benefitted" element of a beneficiary liability claim (Super 8 Mem. at 382), but the Court need not resolve this point since it has already determined that Plaintiffs failed to state a claim.

that Plaintiffs fail to state a beneficiary claim under either theory (Super 8 Reply at 561-563; Choice Hotels Reply at 584-586). ESH did not respond to Plaintiffs' arguments regarding indirect liability because it relied solely on its improper assertion that the Extended Stay was not a franchised location. (*See* ESA Reply at 528 n.12) (stating that that ESH "does not address Plaintiffs' arguments regarding vicarious liability" because the Extended Stay "was not a franchised location."). Because the "[f]ailure to respond to an argument constitutes waiver." *DirecTV, LLC v. Spina*, No. 1:15-CV-00104-JMS, 2015 WL 5098288, at *1 (S.D. Ind. Aug. 27, 2015) (citing *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010)), ESH has therefore conceded this point for purposes of this motion. Choice Hotels and Super 8 have not, so the Court will consider whether Plaintiffs have stated indirect beneficiary liability claims against them.

**Actual Agency.**[7] "[A] plaintiff may hold franchisors vicariously liable under the TVPRA." *J.M.*, 2022 WL 10626493, at *5. "A franchisor-franchisee relationship does not necessarily create an agency relationship," but "a franchisor may be held liable for a franchisee's actions if the franchisor controls the franchisee's day-to-day operations." *J.M.*, 2022 WL 10626493, at *5. Additionally, "[a] franchisor can be held vicariously liable for the torts or other wrongdoing of a franchisee when 'the franchisor controls or has a right to control the specific policy or practice resulting in harm to the plaintiff.'" *Bartolotta v. Dunkin' Brands Grp., Inc.*, No. 16 C 4137, 2016 WL 7104290, at *2 (N.D. Ill. Dec. 6, 2016) (collecting cases) (quoting *Depianti v. Jan-Pro Franchising Int'l, Inc.*, 990 N.E.2d 1054, 1064 (Mass. 2013)).

Plaintiffs allege that all of the Franchisor Defendants exercised control over their franchised hotels by making management hiring decisions, setting room rates and hotel employee compensation, providing standardized training for hotel employees, standardizing hotel job titles

---

[7] Plaintiffs do not expressly assert an apparent agency theory.

31

and responsibilities, and hosting online bookings. (Compl. ¶¶ 113, 117, 119-122, 124). Plaintiffs further allege that the Franchisor Defendants retained the right "to detect criminal activity" at their franchised hotels "using the data supplied by [their] control over franchisees' computer systems, as well as the right to turn over any evidence to law enforcement." (*Id.* ¶ 125). "A majority of district courts have found nearly identical allegations sufficient to plead an agency relationship." *J.M.*, 2022 WL 10626493, at *5 (collecting cases finding allegations sufficient and noting two dissenting cases). Moreover, the existence of an agency relationship is ordinarily a question of fact not suited for resolution on a motion to dismiss. *Johnke v. Espinal-Quiroz*, No. 14 C 6992, 2016 WL 454333, at *9 (N.D. Ill. Feb. 5, 2016). Accordingly, at this stage, Plaintiffs have plausibly alleged that Choice Hotels and Super 8 are vicariously liable for their respective franchisees' violations of Section 1595's financial-beneficiary prong.

**Joint Employer Status.** For separate legal entities to be deemed joint employers, the Seventh Circuit has held, generally, that "each alleged employer must exercise control over the working conditions of the employee, which is a fact-specific inquiry." *Cuff v. Trans States Holdings, Inc.*, 816 F. Supp. 2d 556, 564 (N.D. Ill. 2011) (citing *Moldenhauer v. Tazewell-Pekin Consol. Commc'ns Ctr.*, 536 F.3d 640, 644 (7th Cir. 2008)). "Factors that are relevant to the analysis include whether the alleged employer: (1) had the power to hire and fire employees; (2) supervised and controlled employee work schedules or conditions of payment; (3) determined the rate and method of payment; and (4) maintained employment records." *Id.* (citing *Moldenhauer*, 536 F.3d at 644). Similarly, Illinois courts consider a "putative joint employer's role in hiring and firing; promotions and demotions; setting wages, work hours, and other terms and conditions of employment; discipline; and actual day-to-day supervision and direction of employees on the job."

32

*Meier v. Rohrman*, 2020 IL App (1st) 192401-U, ¶ 31 (internal quotation marks omitted) (quoting *Vill. of Winfield v. Ill. State Lab. Rels. Bd.*, 176 Ill. 2d 54, 60 (1997)).

Because the joint employer inquiry substantially overlaps with the agency relationship inquiry, the same allegations that suffice to plead Choice Hotels' and Super 8's actual agency also suffice, at this stage, to plead their joint employer status. *See Daniel v. Sargent & Lundy, LLC*, No. 09 C 7206, 2012 WL 874419, at *5 (N.D. Ill. Mar. 14, 2012) (noting that "courts apply a common law test based on agency principles to determine" joint employer status); *T.P. v. Wyndham Hotels & Resorts, Inc.*, No. 2:21-CV-04933, 2022 WL 17363234, at *13 (S.D. Ohio Dec. 1, 2022) ("[B]ecause [Plaintiff] alleged sufficient facts to establish an agency relationship between hotel employees and Defendants, her allegations about joint employer status meet the pleading standard for the same reasons as above."); *see also A.Y.S. v. Red Roof Inns, Inc.*, No. 2:22-CV-3767, 2024 WL 1332223, at *10 (S.D. Ohio Mar. 28, 2024) (finding joint employer relationship between franchisor and franchisee plausible where plaintiff alleged that franchisors had "control over several key employment-related policies like training and setting rates of pay").

In sum, Count II survives against Defendants PIC, SBY, ESA P, Litchfield, Courtyard (relative to Courtyard Arlington only), ESH, Choice Hotels, and Super 8, as indicated.

## III. ITVPA Claim (Count III)

Plaintiffs assert Count III against ESA P and ESH only, alleging that "Extended Stay knowingly charged higher rates to Plaintiffs and their trafficker than they did to the general public."[8] (Compl. ¶ 138). Section 15 of the ITVPA creates a civil cause of action for "victim[s] of the sex trade, involuntary servitude, or human trafficking." 740 ILCS 128/15(a). Plaintiffs assert claims under subsections (b)(1) and (c)(2). (*See* Compl. ¶ 137). Pursuant to Section 15(b)(1), "[a]

---

[8] In their response brief, Plaintiffs state that they "concede their ITVPA claims against the remaining Defendants," (Resp. at 494), even though they only asserted Count III against ESA P and ESH. (Compl. ¶ 138).

33

victim of the sex trade has a cause of action against a person or entity who . . . recruits, profits from, or maintains the victim in any sex trade act." Section 15(c)(2) provides that "[t]his Section shall not be construed to create liability to any person or entity who provides goods or services to the general public, who also provides those goods or services to persons who would be liable under subsection (b) of this Section" unless the person or entity "knowingly receives a higher level of compensation from persons or entities liable under subsection (b) of this Section than it generally receives from customers." Persons or entities are liable under subsection (b) if they:

> (1) recruit[], profit[] from, or maintain[] the victim in any sex trade act;
>
> (2) intentionally abuse[], as defined in Section 103 of the Illinois Domestic Violence Act of 1986 [750 ILCS 60/103], or cause[] bodily harm, as defined in Section 11-0.1 of the Criminal Code of 2012 [720 ILCS 5/11-0.1], to a victim of the sex trade; or
>
> (3) knowingly advertise[] or publish[] advertisements for purposes of recruitment into sex trade activity.

740 ILCS 128/15(b).

ESA P and ESH argue that Plaintiffs fail to state a claim under the ITVPA because (1) Plaintiffs have not alleged that they are "victims of the sex trade" within the meaning of the Act; and (2) Plaintiffs have not alleged that ESA P and ESH received a higher level of compensation from someone who is also liable under the Act (*i.e.*, Block) as required by Section 15(c)(2). (ESA Mot. at 341). Neither contention is persuasive.

### A. **"Victims of the Sex Trade"**

ESA P and ESH contend that Plaintiffs have not alleged that they are "victims of the sex trade" under the ITVPA because they allege in the complaint that they were "trafficking victims," rather than victims of one of the specific crimes enumerated in Section 10 of the ITVPA. (ESA Mot. at 341). In response, Plaintiffs allege that they need only allege facts, not legal theories, and

34

that the complaint is sufficient because they have alleged facts showing that they were "solicited to engaged in prostitution." (Resp. at 496).

The allegations in the complaint are indeed sufficient. The ITVPA defines "[s]ex trade" as a violation or attempted violation of certain sections of the Criminal Code of 1961 or the Criminal Code of 2012. 740 ILCS 128/10. The first enumerated section is "11-14.3 (promoting prostitution)." *Id.* Section 11-14.3 of the Criminal Code of 2012, which is titled, "Promoting prostitution," provides, in relevant part,

> (a) Any person who knowingly performs any of the following acts commits promoting prostitution:
>
> > (1) advances prostitution as defined in Section 11-0.1;
> >
> > (2) profits from prostitution by:
> >
> > > (A) compelling a person to become a person engaged in the sex trade;
> > >
> > > (B) arranging or offering to arrange a situation in which a person may practice prostitution; or
> > >
> > > (C) any means other than those described in subparagraph (A) or (B), including from a person who patronizes a person engaged in the sex trade. This paragraph (C) does not apply to a person engaged in prostitution who is under 18 years of age. A person cannot be convicted of promoting prostitution under this paragraph (C) if the practice of prostitution underlying the offense consists exclusively of the accused's own acts of prostitution under Section 11-14 of this Code.[9]

---

[9] Under the Criminal Code of 2012, "prostitution" is knowingly performing, offering, or agreeing to perform any act of sexual penetration as defined in Section 11.01 "for anything of value, or any touching or fondling of the sex organs of one person by another person, for anything of value, for the purpose of sexual arousal or gratification." 720 ILCS 5/11-14(a).

720 ILCS 5/11-14.3(a) (footnote added). As to the crime of promoting prostitution, the ITVPA defines a "victim of the sex trade" as the person intended or compelled to act as a person engaged in the sex trade, or the person engaged in the sex trade from whom anything of value is received. 740 ILCS 128/10(3), (6).

Here, Plaintiffs have plausibly alleged that they were intended or compelled to act as a person engaged in the sex trade *and* that they were persons engaged in the sex trade from whom anything of value was received. Based on the allegations in the complaint, Block abused Plaintiffs physically and mentally in order to maintain control over them and force them to engage in commercial sex work. (*See, e.g.,* Compl. ¶¶ 25-27, 32-33, 84). Plus, he took Plaintiffs' earnings, only leaving them enough money to rent rooms. (*See* Compl. ¶ 7). In sum, Plaintiffs have alleged facts supporting a reasonable inference that they are "victims of sex trafficking" under the ITVPA.

## B. Receipt of Higher Compensation

The ITVPA requires Plaintiffs to allege that ESA P and ESH knowingly received higher compensation *from a person or entity liable under Section 15(b)*. *See* 740 ILCS 128/15(b), (c)(2) (emphasis added). Plaintiffs argue that they have alleged that ESA P and ESH knowingly received a higher level of compensation from Block, albeit indirectly, because Plaintiffs rented the rooms "using Block's money." (Resp. at 496). Plaintiffs further argue that the Extended Stay "knew that Block was [Plaintiffs'] trafficker, and "[a] knowing defendant like [ESA P and ESH] shouldn't be able to hide behind the formality of who physically gave the front desk money." (*Id.*) ESA P and ESH argue that Plaintiffs' allegations are insufficient because the statute requires "a transaction between the trafficker and the defendant." (Resp. at 527).

The Court sides with Plaintiffs again. Plaintiffs allege that "Block took all the money [they] made from commercial sex and left them with only enough cash to pay for hotel rooms" and that

hotel staff at the Extended Stay "used their monitoring of Plaintiffs to charge them more for extending their reservations after days when Plaintiffs had gotten more business." (Compl. ¶¶ 29, 73). Considering these allegations together and drawing all reasonable inferences in Plaintiffs' favor, Plaintiffs have plausibly alleged that ESA P and ESH knowingly received a higher level of compensation from Block, a person liable under Section 15(b). Though Plaintiffs may have physically rented the rooms, their allegations indicate that they did so on Block's behalf and at his direction. Thus, for all intents and purposes, the source of the higher compensation was Block. For these reasons, Plaintiffs ITVPA claim may proceed against ESA P and ESH.

## IV.      Leave to Amend

Plaintiffs request leave to amend should the Court deem any aspect of their complaint deficient. (Resp. at 500). Litchfield takes no apparent position on whether Plaintiff's claims should be dismissed with or without prejudice, but all other Defendants seek dismissal with prejudice. (PIC Mot. at 355; Choice Mem. at 440; SBY Mem. at 362; Super 8 Mem. at 392; ESA Mot. at 343; Marriott Mot. at 394).

"A district court should generally grant leave to amend a complaint after granting a motion to dismiss unless any amendment would be futile or otherwise unwarranted." *Karlinski v. Costco Wholesale Corp.*, 616 F. Supp. 3d 753, 768-769 (N.D. Ill. 2022) (citing *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. and Nw. Ind.*, 786 F.3d 510, 520 (7th Cir. 2015)). Such cases are "rare," and this is not one of them because it is not evident that amendment would be futile or unwarranted. *Runnion*, 786 F.3d at 520. That said, this case has been delayed long enough. Accordingly, all claims are dismissed without prejudice. If Plaintiffs believe that grounds exist after discovery to amend the pleadings to add claims and/or join parties, nothing precludes them from filing an appropriate motion by the deadline that will be set in the case scheduling order.

**CONCLUSION**

For all the foregoing reasons, (1) ESA P Portfolio LLC's motion to dismiss (Dkt. 89) is denied; (2) ESH Strategies Franchise LLC's motion to dismiss (Dkt. 89) is granted as to Count I and the direct beneficiary liability claim alleged in Count II but denied as to Count III and the indirect beneficiary liability claim alleged in Count II; (3) Polanin Investments, Corp.'s motion to dismiss (Dkt. 90) is denied; (4) SBY Downers Grove, LLC's motion to dismiss (Dkt. 92) is denied; (5) Super 8 Worldwide, Inc.'s motion to dismiss (Dkt. 94) is granted as to Count I and the direct beneficiary liability claim alleged in Count II but denied as to the indirect beneficiary liability claim alleged in Count II; (6) Courtyard Management LLC's motion to dismiss (Dkt. 96) is granted to the extent Count I arises from Plaintiffs' alleged trafficking at the Courtyard by Marriott Chicago Elgin-West Dundee but denied otherwise; (7) Marriott Hotel Services LLC's motion to dismiss (Dkt. 96) is granted; (8) Litchfield Motel, Inc.'s motion to dismiss (Dkt. 99) is denied; and (9) Choice Hotels International, Inc.'s motion to dismiss (Dkt. 100) is granted as to Count I and the direct beneficiary liability claim alleged in Count II but denied as to the indirect beneficiary liability claim alleged in Count II.

Defendants must answer the surviving claims by May 29, 2026, and the parties must file a joint proposed discovery plan by June 5, 2026.

**DATED**: May 8, 2026
                      **ENTERED**:

_LaShonda A Hunt_
LASHONDA A. HUNT
United States District Judge

38